DOWNEY BRAND LLP
MELISSA A. THORME (Bar No. 151278)
BRIAN HAMILTON (Bar No. 295994)
SAM BIVINS (Bar No.300965)
MONICA BROWNER (Bar No.329717)
621 Capitol Mall, 18th Floor
Sacramento, CA 95814-4731
Telephone: (916) 444-1000
Facsimile: (916) 444-2100
mthorme@downeybrand.com
sbivins@downeybrand.com
bhamilton@downeybrand.com
mbrowner@downeybrand.com

Attorneys for Plaintiffs
CLEAN WATER SOCAL and
CENTRAL VALLEY CLEAN WATER
ASSOCIATION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLEAN WATER SOCAL and CENTRAL VALLEY CLEAN WATER ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and TOMAS TORRES, DIRECTOR, WATER DIVISION of UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, REGION IX, <br><br> Defendants. | Case No. 2:2023-cv-3930 <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

DOWNEY BRAND LLP

Plaintiffs Clean Water SoCal and Central Valley Clean Water Association ("CVCWA") ("Plaintiffs") brings this action against Defendant United States Environmental Protection Agency; Tomas Torres, Director, Water Division, United States Environmental Protection Agency, Region IX; and Doe Defendants 1 to 10 (collectively referred to as either "USEPA" or "Defendants"), to challenge and invalidate USEPA's actions that violated the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551 and 702 *et seq*., and statute and regulations implementing the Federal Water Pollution Control Act (commonly known as the "Clean Water Act" or "CWA"), 33 U.S.C. § 1251 *et seq.*, and 40 C.F.R. Part 131, and allege as follows:

## I. INTRODUCTION

1.     A full understanding of this case requires some history. In June of 2010, the United States Environmental Protection Agency ("USEPA") issued a new guidance document discussing a new methodology for determining Whole Effluent Toxicity ("WET") tests, known as the Test of Significant Toxicity ("TST"). Not only is this guidance non-binding by definition, but the TST Guidance document itself explicitly included a disclaimer that stated that the guidance document "cannot impose any legally binding requirements on EPA, states, NPDES[1] permittees, or laboratories conducting or using WET testing for permittees" and "nor is this document a permit or regulation itself."

2.     Notwithstanding this clear disclaimer, on March 17, 2014, USEPA has urged use of the TST in regulatory contexts and, to enhance that ability, approved a request from California's water quality agency, the State Water Resources Control Board ("State Water Board"), to use the 2010 TST Guidance method for conducting chronic WET tests, urging a two-concentration TST approach instead of the

---

[1] This acronym stands for National Pollutant Discharge Elimination System (NPDES). *See* 33 U.S.C. § 1342.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

DOWNEY BRAND LLP

promulgated five-concentration dose-response review method, as a "limited use" Alternate Test Procedure ("ATP") under 40 C.F.R. section 136.5.

3.     USEPA's March 17, 2014 action effectively promulgated a new ATP or a new method modification in contravention of federal law and regulations. Furthermore, USEPA's March 17, 2014 action impermissibly exceeded USEPA's authority by mandating the statewide use of the two-concentration TST in all new or revised National Pollutant Discharge Elimination System ("NPDES") permits issued by the State Water Board and Regional Water Quality Control Boards and in any EPA-issued California permits that include WET provisions, for both inland and ocean dischargers. This mandate effectively overruled promulgated federal and state regulations, including, but not limited to, Water Quality Control Plans, such as the California Ocean Plan and regional Basin Plans.

4.     Neither USEPA nor the State Water Board had the authority to impose or mandate the use of this two-concentration TST until that method has been promulgated by EPA as an approved method under federal regulations at 40 C.F.R. Part 136. Analytical results obtained by using a non-promulgated method cannot be used for monitoring or NPDES permit compliance determination purposes until that method has been properly approved under and incorporated into 40 C.F.R. Part 136. *See, e.g.*, 40 C.F.R. § 122.41(j)(4); § 122.44(i)(1)(iv).

5.     For these reasons, USEPA's March 17, 2014 final agency action was judicially challenged. As a result, USEPA withdrew its March 17, 2014 ATP approval on February 11, 2015, effective immediately, prior to any ruling on the merits in the litigation.

6.     Under the Clean Water Act, states must adopt water quality standards and submit them for approval by USEPA. 33 U.S.C. § 1313(2)(B); 40 C.F.R. § 131.6. USEPA must approve the new standards within sixty (60) days, or shall disapprove "not later than the ninetieth day after the date of submission of such standards" 33 U.S.C. § 1313(c)(3). Once approved by USEPA, the state water quality standards

DOWNEY BRAND LLP

become effective and applicable under the CWA. 40 C.F.R. § 131.21(c). "Such standards serve the dual purpose of establishing the water quality goals for a specific water body and serve as the regulatory basis for establishment of water-quality-based treatment controls and strategies beyond the technology-based levels of treatment" required by the CWA. 40 C.F.R. § 131.2.

7.      On December 1, 2020 (and as subsequently revised and readopted on October 5, 2021), the State Water Board adopted new toxicity water quality standards and related implementation provisions called the "State Policy for Water Quality Control: Toxicity Provisions" (the "Toxicity Provisions"). The Toxicity Provisions' new numeric WET water quality standards are based on the TST even though in over a decade USEPA has never formally promulgated the TST as part of the approved Part 136 methods. USEPA reviewed the Toxicity Provisions since their adoption in 2021 despite a statutory requirement to make an approval/disapproval decision within sixty (60) or ninety (90) days respectively. 33 U.S.C. § 1313(c)(3); 40 C.F.R. § 131.21(a)(1)-(2).

8.      On or about May 1, 2023, USEPA finally issued an approval decision on the water quality standards portion of the Toxicity Provisions, which then became effective for federal law purposes and useable as water quality standards and effluent limitations in NPDES permits. Petitioners seek declaratory relief as to the legality of USEPA's final agency action to approve the Provision's water quality standards, as well as injunctive relief to maintain the status quo pending a final decision on the merits in this case.

9.      USEPA's May 1, 2023 document, "Approval of New Water Quality Standards: California State Policy for Water Quality Control: Toxicity Provisions," was issued despite being outside the statutory and regulatory decision-making windows of sixty or ninety days. Because of the extended length of USEPA's delay, Plaintiffs' counsel asked USEPA to defer any action a bit longer until after a state court challenge to the Toxicity Provisions could be heard on the merits on June 23,

DOWNEY BRAND LLP

2023, less than 2 months after the USEPA final agency action was issued, to potentially avoid this federal litigation.

10. The Toxicity Provisions were not in effect for federal law purposes until USEPA approved them, which warrants an injunction since USEPA's May 1, 2023 approval was the final step in making the Toxicity Provisions fully effective. USEPA's approval action failed to comply with the law and exceeded its statutory authority in improperly approving the toxicity water quality standards contained in the State Water Board's Toxicity Provisions that mandate the use of the TST to determine compliance with toxicity water quality standards in all applicable waterbodies and through all relevant NPDES permits. A true and correct copy of USEPA's May 1, 2023 approval letter is attached as **Exhibit A.**

11. Plaintiffs are trade associations with member agencies that own and operate wastewater treatment plants and water reclamation plants, often called Publicly Owned Treatment Works ("POTWs"), which are designed to collect and treat municipal and industrial wastewater. Many of Plaintiffs' members operate pursuant to NPDES permits issued by the State Water Board, Regional Water Quality Control Boards, or USEPA that include chronic toxicity testing and compliance provisions.

12. Plaintiffs' members are either currently or now imminently subject to the unjustifiably onerous impacts of the TST, a test procedure that relies upon a default statistical inference known as a "null hypothesis." Under USEPA's promulgated Part 136 toxicity test methods, the null hypothesis presumes all water is *not toxic* unless proven otherwise; similar to the legal presumption of innocence. The null hypothesis under the TST turns that normal presumption on its head by presuming water *is toxic* unless proven not to be so, which is highly problematic when applied in a strict liability context such as under the CWA. 33 U.S.C. §§ 1251, *et seq.*

13. USEPA's failure to comply with the law, as set forth herein, subjects

DOWNEY BRAND LLP

that federal agency's actions to judicial review under the APA. In this case, Plaintiffs seek a declaration that USEPA acted contrary to the mandates of the APA, the CWA, and the regulations implementing the CWA, and exceeded its statutory authority. As a result, USEPA's actions must be declared unlawful and void. 28 U.S.C. § 2201; Fed. R. Civ. P. 57. Plaintiffs further seek a temporary restraining order, and preliminary and permanent injunctive relief to maintain the status quo pending adjudication, and to forestall irreparable injury to Plaintiffs' members and others in the meantime. 28 U.S.C. § 2202; Fed. R. Civ. P. 65.

## II. JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this final agency action pursuant to 28 U.S.C. section 1331 (federal question jurisdiction), section 1346 (United States as a Defendant), section 2201 (authorizing declaratory relief), section 2202 (authorizing injunctive relief), and pursuant to 5 U.S.C. section 702 (providing for judicial review of agency action under the APA).

15.     Plaintiffs have standing to bring this suit on behalf of their members because at least one of their members would have standing to sue in its own right; the interests Plaintiffs seek to protect are germane to their purposes; and neither the claim asserted nor the relief requested requires an individual member to participate in this suit. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010).

16.     Defendants have waived sovereign immunity pursuant to provisions of the APA, 5 U.S.C. sections 701-706.

17.     Venue is proper in this Court under 28 U.S.C. section 1391(e) because this case represents an action against an agency of the United States; Plaintiff Clean Water SoCal maintains its principal place of business in this judicial district; and a substantial part of the events to implement the Toxicity Provisions at issue in this case will occur in this district.

**III. PARTIES**

18.    Clean Water SoCal is a non-profit corporation organized to help ensure that regulations affecting POTWs and collection systems are reasonable, lawful, and in the public's best interest. Clean Water SoCal provides leadership, technical assistance, and timely information to its members in order to promote regulations and regulatory programs that focus on the sustainable protection of the environment and public health, and acts to represent and advocate for the interests of its members on issues of importance where, as here, federal and state agencies veer from the requirements set forth in laws and regulations.

19.    CVCWA is a non-profit industry trade association representing municipalities and other public entities located within the Central Valley region that provide wastewater collection, treatment, and water recycling services to millions of Central Valley residents and businesses. CVCWA participates in litigation where, as here, topics of import to the CVCWA membership are raised.

20.    Defendant USEPA is the United States agency primarily responsible for the implementation of the Clean Water Act and for oversight of its regional offices, including USEPA Region IX, and the states acting or exercising permitting authority granted under the CWA. Defendant USEPA is also an agency of the United States charged with certain responsibilities under the APA.

21.    Defendant Tomas Torres is the Water Division Director of USEPA Region IX of the USEPA and is signatory of the challenged May 1, 2023 water quality standards approval action. Mr. Torres is sued in his official capacity.

**IV. LEGAL BACKGROUND**

22.    The CWA created a method for adopting water quality standards and a system for permitting wastewater discharges through the NPDES program that maintain such water quality standards. Under CWA sections 301 and 402, all facilities which discharge pollutants from any point source into waters of the United States are required to obtain an NPDES permit. Effluent limitations serve as the

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

primary mechanism in NPDES permits for controlling discharges of pollutants from point sources to receiving waters. Water quality standards are used as the basis for deriving the specific water quality-based effluent limitations in NPDES permits that supplement technology-based standards. 40 C.F.R. § 122.44(d); § 131.2.

23.     USEPA is required to review and to approve or disapprove state-adopted water quality standards under the CWA. Under CWA section 303(c), "a water quality standard . . . consist[s] of the <u>designated uses</u> of the navigable waters involved and the <u>water quality criteria</u> for such waters based upon such uses. 33 U.S.C. § 1313(c)(2)(A) (emphasis added). Generally, "uses" are the types of activities for which the water can be used (e.g., recreation, aquatic life), and "criteria" are the numeric or narrative water quality levels necessary to support the water's designated uses. Numeric criteria are expressed as specific concentrations of individual pollutants (e.g., no more than 5 mg/l pollutant X). Narrative criteria (e.g., no toxics in toxic amounts) are the catch-all of water quality regulation, expressed as narrative statements describing a desired water quality goal.

24.     Within the NPDES program, freshwater and marine acute and chronic whole effluent toxicity tests are used in conjunction with other chemical analyses to evaluate and assess the compliance of wastewater discharges and surface waters with water quality standards under the CWA.

25.     "Whole effluent toxicity" or "WET" is a term used to describe the aggregate toxic effect of an aqueous sample (e.g., whole effluent wastewater discharge) as measured by a laboratory organism's response upon exposure to the sample, including lethality or death (acute toxicity), or impaired growth or reduced reproduction (chronic toxicity). WET tests are designed to replicate the total effect and environmental exposure of aquatic life to toxic pollutants in an effluent without initially identifying the specific pollutants causing toxicity. Since WET is not a pollutant, more in-depth analyses, known as Toxicity Identification Evaluations ("TIEs") and Toxicity Reduction Evaluations ("TREs"), are performed if toxicity is

DOWNEY BRAND LLP

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

detected in order to determine what pollutant or pollutants are likely causing the toxicity effect. Then, the pollutant(s) actually causing toxicity can be controlled.

26.     Chronic toxicity testing is meant to assess *long-term* impacts to biological communities of organisms in the ambient receiving waters, not the impact of a single day's discharge. *See accord* 40 C.F.R. § 131.38(b)(l), fn. d. Acute toxicity is meant to assess short-term impacts on survival of aquatic organisms.

27.     CWA Section 304(h) requires USEPA to "promulgate guidelines establishing test procedures for the analysis of pollutants that shall include the factors which must be provided in any certification pursuant to section 401 of [the CWA] or permit application pursuant to section 402 of [the CWA]." 33 U.S.C. § 1314(h).

28.     USEPA regulations at 40 C.F.R. Part 136 prescribe the specific test procedures and methods that must be used for the analysis of pollutants in all applications and reports submitted under the NPDES program under section 402 of the CWA, as well as State certifications pursuant to section 401 of the CWA. 40 C.F.R. §§ 136.1(a), 136.3; *see, e.g.*, 40 C.F.R. § 122.44(i)(iv) (monitoring to be done according to test procedures approved under 40 C.F.R. Part 136).

29.     Under limited circumstances and subject to specific regulatory requirements, a person may request to use an Alternative Test Procedure ("ATP") not previously approved and formally promulgated by USEPA. 40 C.F.R. § 136.3(a). The ATP process was designed to "encourage organizations *external to EPA* to develop and submit for approval new analytical methods." *See Guide to Method Flexibility and Approval of EPA Water Methods*, USEPA Office of Water (Dec. 1996) at p. 77. USEPA regulations at sections 136.4 and 136.5 describe the specific procedures and requirements for obtaining USEPA review and approval of ATPs. 40 C.F.R. §§ 136.4, 136.5.

30.     Under 40 C.F.R. section 136.6, a person may make limited minor modifications to an approved testing method included in 40 C.F.R. Part 136.3 without prior USEPA approval, including for example, changing purge volumes and

DOWNEY BRAND LLP

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

automating manual methods. However, changes to the determinative step, the quality control, or significant chemistry of the method, are outside the scope of modifications authorized by section 136.6. Additionally, the Method Modification approach under section 136.6 applies only to CWA <u>chemical</u> methods and cannot be used for "Method-Defined Analytes." Specifically, USEPA regulations prohibit modifications of WET methods. 40 C.F.R. § 136.6(b)(3) ("Restrictions. An analyst <u>may not modify an approved Clean Water Act analytical method for a method-defined analyte</u>.") (emphasis added). Whole effluent toxicity methods are *not chemical methods* and USEPA has previously declared that WET is a Method-Defined Analyte. *See* 67 Fed. Reg. 69,965 ("toxicity is inherently defined by the measurement system (a 'method-defined analyte') and toxicity cannot be independently measured apart from a toxicity test.").

31.  In November of 2002, USEPA promulgated in the Federal Register through a formal rulemaking process short-term chronic WET test methods for use in monitoring compliance with NPDES permit limitations in accordance with 40 C.F.R. Part 136. *See* Guidelines Establishing Test Procedures for the Analysis of Pollutants; Whole Effluent Toxicity Test Methods; Final Rule, 67 Fed. Reg. 69,952 (Nov. 19, 2002) (the "2002 Rule"). These methods specifically include two endpoints: the No-Observed-Effect-Concentration ("NOEC") and the 25% Inhibition Concentration ("IC25"). The 2002 Rule incorporated by reference USEPA's WET methods documents (namely USEPA, Short-term Methods for Estimating the Chronic Toxicity of Effluents and Receiving Waters to Freshwater Organisms, EPA–821–R–02–013. Fourth Edition, October 2002; "2002 Methods"). 40 C.F.R. § 136.3(a), Table IA, fn 26. Where the rule's 2002 Methods allow hypothesis testing, a null hypothesis is specified that presumes an effluent sample is non-toxic, and requires testing to determine compliance with an NPDES effluent limitation consisting of a control group and a minimum of five effluent concentrations in order to evaluate the validity of the dose-response relationship. *See* 2002 Rule, 67 Fed.

Reg. 69,962-63. The 2002 Methods also specify the four allowable types of statistics that can be used, and do not mention the TST or provide that the TST may be used as part of an approved method. In addition, the USEPA in the 2002 Rule and 2002 Methods specifically "recommends the use of point estimation techniques over hypothesis testing approaches for calculating endpoints for effluent toxicity testing." *Id.* at 69,958.

32.     In June of 2010, USEPA issued a guidance document regarding a potential new supplemental statistical method for use in WET testing called the TST. *See* National Pollutant Discharge Elimination System Test of Significant Toxicity Implementation Document, EPA 833-R-10-003 (June 2010). The TST procedure is designed for the toxicity test to be performed on test organisms using two test concentrations: a control group and an effluent-exposed group. The TST statistical method was merely confined to a guidance document, which was not promulgated through notice and comment rulemaking and which includes an explicit disclaimer in that guidance document specifically confirming that the document is not "a permit or a regulation itself." In fact, that guidance document stated:

> The document does not and cannot impose any legally binding requirements on EPA, states, NPDES permittees, or laboratories conducting or using WET testing for permittees (or for states in evaluating ambient water quality). EPA could revise this document without public notice to reflect changes in EPA policy and guidance.

33.     In 2012, USEPA amended the whole effluent toxicity test methods in its modifications to the Promulgated Guidelines Establishing Test Procedures for the Analysis of Pollutants under the Clean Water Act: Analysis and Sampling Procedures. Final Rule, 77 Fed. Reg. 29758 (May 18, 2012). These amendments did *not* incorporate the TST, even though the TST approach had been available as guidance for nearly two years. Several other amendments to the Part 136 methods were made over the next decade, yet none included the TST.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

DOWNEY BRAND LLP

# V. FACTUAL BACKGROUND

34.     USEPA Region IX has been urging the State of California to utilize the TST approach in NPDES permits over the past decade or longer. Permit holders have objected to the use of the TST approach since this approach is based solely on informal guidance documents, not on any formally promulgated and publicly vetted rule, and using pass/fail bioequivalence methods never before used in compliance determinations under the Clean Water Act.

35.     In order to overcome stakeholder objections, on February 12, 2014, the State Water Board requested USEPA Region IX approval of "a two-concentration test design when using the Test of Significant Toxicity (TST) hypothesis testing approach" "[p]ursuant to Code of Federal Regulations, title 40, section 136.4." On March 17, 2014, USEPA Region IX, in turn and in record time, approved a statewide, limited use ATP under 40 C.F.R. Part 136.5. *See* EPA ATP Approval Letter from Eugenia McNaughton, Ph.D. to Renee Spear, SWRCB (March 17, 2014).

36.     USEPA Region IX went beyond approving the limited use ATP request to apparently *mandating* the use of the two-concentration TST, stating that "it will apply to all new or revised NPDES permits issued by the State Water Board and Regional Water Quality Control Boards and any EPA-issued California permits that include whole effluent toxicity provisions." *See* USEPA ATP Approval Letter from Eugenia McNaughton, Ph.D. to Renee Spear, SWRCB (March 17, 2014) (emphasis added). Further, USEPA applied this ATP to non-ocean and ocean waters, even though application to ocean waters was not requested by the State Water Board in its ATP request.

37.     This action was challenged in federal court by Clean Water SoCal's predecessor organization. As a result, USEPA withdrew its ATP approval document. However, USEPA continued to encourage use of the TST in permitting and water quality standards by California's Water Boards, which have delegated authority to regulate under the CWA subject to USEPA oversight.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

DOWNEY BRAND LLP

38. The State Water Board adopted its Toxicity Provisions initially on December 1, 2020. Those Toxicity Provisions were revoked and superseded by the State Water Board and were ultimately approved by the State Water Board a year and a half ago, on October 5, 2021, and were submitted to USEPA for approval soon thereafter. The Toxicity Provisions became effective for state law purposes on April 25, 2022, but were not effective under federal law until approved by USEPA on May 1, 2023.

39. Clean Water SoCal, along with other petitioners/plaintiffs, challenged the Toxicity Provisions under the State Water Code, Government Code, and California Environmental Quality Act ("CEQA") in state court with a hearing on the petition for writ of mandate set for June 23, 2023. Plaintiffs' counsel was in contact with USEPA's counsel on a regular basis, asking that USEPA wait to act on the approval or disapproval of the Toxicity Provisions' water quality standards until after the state court ruled on the legality under state law. Despite the extensive review period already undertaken, far longer than authorized by statute, USEPA failed to agree with Plaintiffs' counsel's request to wait a bit longer and issued an approval letter on May 1, 2023, less than two months before a merits hearing on the petitioners/plaintiffs' state petitions for writ of mandate and complaint.

**VI. LEGAL ISSUES WITH REQUIREMENTS BASED ON THE TST**

**A.    The Approved Toxicity Provisions Unlawfully Modify USEPA's Promulgated Methods.**

40. Whole Effluent Toxicity (WET) test procedures were promulgated and approved as standardized test methods by EPA in 2002 as required by Section 1314 of the Clean Water Act. 67 Fed. Reg. 69,952 (Nov. 19, 2002). The actual test procedures are described in a series of method manuals. *Id.* at p. 69,971. These manuals, and the related procedures for each WET test method, are now specified by rule at 40 C.F.R. § 136.3, Table lA, No. 10, which as shown below specifies only the endpoints of "NOEC or IC25, percent effluent" for chronic toxicity; not Pass/Fail

DOWNEY BRAND LLP

units using TST. Similarly, Table IA, No. 8. excerpted below, only specifies "Toxicity, acute, fresh water organisms, LC50, percent effluent"; not TST.

Table IA—List of Approved Biological Methods for Wastewater and Sewage Sludge

| Parameter and units | Method[1] | EPA | Standard methods | AOAC, ASTM, USGS | Other |
|---|---|---|---|---|---|
| Aquatic Toxicity | | | | | |
| 8. Toxicity, acute, fresh water organisms, $LC_{50}$, percent effluent | Water flea, Cladoceran, *Ceriodaphnia dubia* acute | 2002.0 [25] | | | |
| 10. Toxicity, chronic, fresh water organisms, NOEC or $IC_{25}$, percent effluent | Fish, Fathead minnow, *Pimephales promelas*, larval survival and growth | 1000.0 [26] | | | |

[25] Methods for Measuring the Acute Toxicity of Effluents and Receiving Waters to Freshwater and Marine Organisms, EPA–821–R–02–012. Fifth Edition, October 2002. U.S. EPA; and U.S. EPA Whole Effluent Toxicity Methods Errata Sheet, EPA 821–R–02–012–ES. December 2016.

[26] Short-term Methods for Estimating the Chronic Toxicity of Effluents and Receiving Waters to Freshwater Organisms, EPA–821–R–02–013. Fourth Edition, October 2002. U.S. EPA; and U.S. EPA Whole Effluent Toxicity Methods Errata Sheet, EPA 821–R–02–012–ES. December 2016.

41.    According to USEPA, the TST represents "an alternative statistical approach for analyzing and interpreting valid WET data." USEPA, National Pollutant Discharge Elimination System Test of Significant Toxicity Technical Document, EPA-833-R-10-004 (June, 2010) p . 60. Consequently, the TST provides a new and different determinative technique for the way in which the analyte toxicity is identified and quantified. For method-defined analytes, the statistical technique used to determine the presence or absence of toxicity is part of the method. Any change to these techniques constitutes an impermissible modification to the approved

DOWNEY BRAND LLP

method. Such modifications can only be authorized through a formal USEPA rulemaking process like the one used to promulgate the original WET test methods. 33 U.S.C. § 1314(h); 40 C.F.R. § 136.4.

42.     The State Water Board in the administrative record for the Toxicity Provisions acknowledged that "for a small number of tests, the TST approach may determine a different outcome than other statistical approaches." Toxicity Provisions, 2021 Staff Report at 181. If there were no difference in outcome, then there would be no reason to use or approve the TST in lieu of the promulgated statistical methods. However, the number of times the TST reaches a different outcome is not "small." In fact, data from the State Board's "Test Drive" study showed that the TST came to a different conclusion in about 8% of all *Ceriodaphnia dubia* reproduction tests (the single most common species used to evaluate wastewater discharges to freshwater streams in California). In these tests, the TST was nearly twice as likely to label the sample "toxic" compared to the NOEC endpoint. Moreover, the TST is three times more likely to label the sample as "toxic" compared to the IC-25 procedure that EPA's 2002 Methods manual states is the preferred approach for NPDES permitting. *See* 2002 Methods at p. 41, section 9.5.l (Attachment 2). Such discrepancies demonstrate that the TST does not qualify as a "sound scientific rationale" or a "scientifically defensible method" since the TST does not provide performance equivalent to that of USEPA's promulgated methods and cannot be used to set water quality standards or assess compliance with NPDES permit limits pertaining to toxicity.

43.     The TST statistical hypothesis test consistently "detects" the existence of toxicity more frequently than the NOEC statistical hypothesis test, especially for freshwater test species. *See* State Water Board, *Effluent, Stormwater and Ambient Toxicity Test Drive Analysis of the Test of Significant Toxicity (TST)* ("State Board Test Drive") (Dec., 2011) (*see, e.g.*, Chronic Freshwater results in Table E-1).

DOWNEY BRAND LLP

1864083v1

15

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

However, one should not assume that greater statistical *sensitivity* equates with improved *accuracy* in WET testing.

44.     Reanalysis of data from USEPA's inter-laboratory WET variability study indicates that the TST statistical hypothesis test also "detects" toxicity in clean blank samples at a rate up to three times higher than the NOEC statistical test. USEPA, *Final Report: Interlaboratory Variability Study of EPA Short-term Chronic and Acute Whole Effluent Toxicity Test Methods,* Vol. 1; EPA-821-B-01-004 (Sept., 2001) . Blank samples are those comprised solely of laboratory dilution water that is known to be <u>non-toxic</u> before the test begins. Such inaccuracies demonstrate that the TST does not provide performance "acceptably equivalent" to that of the standard methods that were promulgated in 40 C.F.R. Part 136 in the 2002 Methods.

45.     Federal courts have held that where USEPA utilizes a guidance document to compel regulated parties to "enhance the monitoring required in individual permits beyond that contained in State or federal emission standards even when those standards demand some sort of periodic testing, EPA has in effect amended [the regulation.] This it cannot legally do without complying with the rulemaking procedures . . ." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1028 (D.C. Cir. 2000; *see also Iowa League of Cities v. EPA*, 711 F.3d 844, 876 (8th Cir. 2013); *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) ("An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule.").)

46.     The approved 2002 Methods also clearly require a multi-concentration test design with dose-response evaluation.  The 2002 Methods manual states:

> The tests recommended for use in determining discharge permit compliance in the NPDES program are <u>multi-concentration</u>, or definitive, <u>tests which provide (1) a point estimate of effluent toxicity in terms of an IC25, IC50, or LC50, or (2) a no-observed-effect-</u>

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1864083v1

DOWNEY BRAND LLP

concentration (NOEC) defined in terms of mortality, growth, reproduction, and/or teratogenicity and obtained by hypothesis testing;

The concentration-response relationship generated for each multi-concentration test must be reviewed to ensure that calculated test results are interpreted appropriately; and

"Tables 1, 3, and 4 (labeled as 3) - SUMMARY OF TEST CONDITIONS AND TEST ACCEPTABILITY CRITERIA WITH EFFLUENTS AND RECEIVING WATERS (TEST METHODS 1000.0, 1002.0, AND 1003.0): Test concentrations: Effluents: 5 and a control (required minimum).

*See* 2002 Methods manual at pp. 36, 50, Sections 8.10.1, 10.2.6.2 (all emphasis added). In addition, the 2002 Manual also makes clear that consideration of PMSD is a required element of the procedure by stating:

When NPDES permits require sublethal hypothesis testing endpoints from Methods 1000.0, 1002.0, or 1003.0 (e.g., growth or reproduction NOECs and LOECs), within-test variability must be reviewed and variability criteria must be applied as described in this section.

(*Id.* at Section 10.2.8.2) (emphasis added).

47. For the purposes of evaluating within-test variability, the approved 2002 Methods consistently rely on use of the PMSD as a tool. A higher PMSD is equivalent to greater within-test variability while a lower PMSD indicates lower within-test variability. The 2002 Manual describes mandatory criteria using the PMSD for interpreting and validating sublethal hypothesis test results using the PMSD metric. *See* 2002 Manual at p. 51 (Section 10.2.8.2, 10.2.8.2.1) ("To measure test variability, calculate the percent minimum significant difference (PMSD) achieved in the test."). As quoted above, the approved 2002 Methods require review of the PMSD for any NPDES chronic toxicity hypothesis tests. The TST is a form of hypothesis test conducted on a chronic/sublethal endpoint (albeit one not authorized by the 2002 Manual), and is not subject to the PMSD criteria described

DOWNEY BRAND LLP

1   in the 2002 Manual.

2       48.   In fact, the Toxicity Provisions do not reference or use the PMSD

3   criteria and ignore the mandated steps for quality assurance in the 2002 Manual. The

4   Toxicity Provisions provide no authority for, or even guidance documents

5   recommending, exclusion of the use of PMSD criteria. Thus, USEPA's approval of

6   these revised water quality standards contrary to the mandated test methods are

7   inconsistent and contradictory to specific requirements contained in the approved

8   Part 136 methods, and reduce the reliability of the test result.

9       49.   USEPA has had ample opportunity to approve the TST in its Part 136

10  regulations, including in its most recent rulemakings, but has not done so. *See U.S.*

11  *v. Riverside Bayview Homes*, 474 U.S. 121, 137 (1985) (An action not to include

12  modifications of which the entity was aware can be read as a presumption that the

13  modifications were not intended to be included). In fact, although USEPA recently

14  proposed amendments to the Part 136 methods, including specific changes to the

15  2002 Methods, the TST was not included. *See*, *e.g.*, Federal Register Notice,

16  http://www.govinfo.gov/content/pkg/FR-2019-10-22/pdf/2019-223437.pdf    (Oct.

17  22, 2019). Numerous amendments to Part 136 have occurred since 2010, and none

18  have included the TST. If USEPA truly believed that the TST was a more effective

19  and worthy test method, then the TST would or should have been proposed for

20  inclusion into the promulgated regulations for use nationwide.

21  **B.   The Toxicity Provisions' Unauthorized Null Hypothesis Deems All**

22  **Water "Toxic."**

23      50.   Current law presumes that a water sample (either from a river/creek/bay

24  or from a discharge) is *not toxic* until proven to be toxic as set forth in the

25  promulgated methods. The approved Toxicity Provisions flip that presumption on its

26  head. Under the Toxicity Provisions, all tested water in reservoirs, bays, and rivers,

27  and from all wastewater, recycled, and storm water discharges to receiving waters

28  will be initially ***presumed to be toxic.*** This is 180 degrees opposite of the USEPA

DOWNEY BRAND LLP

rule requirements, and contrary to law. The current "objective of aquatic toxicity tests with effluents or pure compounds is to estimate the 'safe' or 'no effect' concentration of these substances, which is defined as the concentration which will permit normal propagation of fish and other aquatic life in the receiving waters." *See* USEPA, 2002 Methods at Section 2.1.1 and 9 .1.1.

51.    Flipping the hypothesis also flips the error percentage. The 2002 Methods determined a 5% alpha error rate (non-toxic water declared toxic), but did not specifically define a potentially higher beta error rate (toxic water not declared toxic), but this rate has been recognized to be "up to 20%."[2] Under the Toxicity Provisions, the beta error rate of up to 20% flips to become the alpha error rate, which creates more potential liability for dischargers (from false "Failures"). This "guilty until proven innocent" approach, and statistical guarantee to be in violation up to 20% percent of the time (if not more depending on test species used), when it is undeniable that proving a negative is difficult if not impossible, should not have been approved by USEPA. This would be the equivalent of deeming everyone to be a criminal until proven otherwise. No United States law authorizes such a presumption, particularly under a strict liability statute such as the CWA that ascribes civil and criminal penalties and even potentially jail time for violations that at least one fifth of the time could be wrong. This equates to giving ten men pregnancy tests and 2 of the tests claim the men are pregnant.

**C. The Toxicity Provisions Allow Unauthorized "Pass/Fail" Hypothesis Endpoint.**

52.    As shown in Table IA copied above, USEPA rules for hypothesis testing prescribe specific test endpoints (e.g., NOEC/LOEC). 40 C.F.R. § 136.3; 2002

---

[2] *Edison Electric v. EPA,* 391 F.3d 1267, 1272 (D.C. Cir. 2004). In a legal challenge to the 2002 Methods, the court found that "[t]he ratified WET tests are not without their flaws"" and cautioned that "[e]ven by EPA's calculations, WET tests will be wrong some of the time."

DOWNEY BRAND LLP

Methods at section 9.3.1.1 ("When hypothesis tests are used to analyze toxicity test data, it is not possible to express precision in terms of a commonly used statistic. The results of the test are given in terms of two endpoints, the No-Observed- Effect Concentration (NOEC) and the Lowest-Observed-Effect Concentration (LOEC).") The Toxicity Provisions include a *new* test endpoint of **Pass/Fail** despite USEPA discouraging the use of pass/fail. The 2002 Methods incorporated into 40 C.F.R. Part 136 state the following (emphasis in original):

> 2.2.3 Use of pass/fail tests consisting of a single effluent concentration (e.g., the receiving water concentration or RWC) and a control is **not recommended.**

53.   Because Pass/Fail is not an authorized test endpoint, USEPA had no authority to approve the Toxicity Provisions water quality standards that use a Pass/Fail test endpoint, or approve use of Pass/Fail as an effluent limitation to implement those standards. In fact, USEPA's 2002 Methods express concern that "single concentration, pass/fail, toxicity tests do not provide sufficient concentration-response information on effluent toxicity to determine compliance. It is the Agency's policy that all effluent toxicity tests include a minimum of five effluent concentrations and a control." *See* USEPA, Whole Effluent Toxicity: Guidelines Establishing Test Procedures for the Analysis of Pollutants - Supplementary Information Document (SID) at pg. 28 (Oct. 2, 1995).

54.   Because of the general unreliability and inaccuracy of these biological tests, and the amplifying effects on the false Failure error rate imposed by the TST method, strictly construed "Pass/Fail" water quality standards for toxicity are inappropriate, infeasible to consistently attain or comply with, and should not have been approved by USEPA.

**D.    The Toxicity Provisions' Unauthorized Statistical Approach.**

55.    Instead of using one of Part 136's four specified hypothesis testing statistics, the Toxicity Provisions use the TST statistical approach, which as discussed

DOWNEY BRAND LLP

above was *not* included or incorporated by reference in USEPA's Part 136 test methods. Relying upon the one highlighted sentence in the USEPA 2002 Methods set forth below, and ignoring the other context in the same paragraph, USEPA's approval letter attempts to justify use of an unpromulgated statistical approach. The entire section of the 2002 Methods states the following (highlighting and underlining added):

> 9.4.1.2 The statistical methods recommended in this manual are not the only possible methods of statistical analysis. Many other methods have been proposed and considered. Certainly there are other reasonable and defensible methods of statistical analysis for this kind of toxicity data. Among alternative hypothesis tests some, like Williams' Test, require additional assumptions, while others, like the bootstrap methods, require computer-intensive computations. Alternative point estimation approaches most probably would require the services of a statistician to determine the appropriateness of the model (goodness of fit), higher order linear or nonlinear models, confidence intervals for estimates generated by inverse regression, etc. In addition, point estimation or regression approaches would require the specification by biologists or toxicologists of some low level of adverse effect that would be deemed acceptable or safe. <u>The statistical methods contained in this</u> <u>manual have been chosen</u> because they are (1) applicable to most of the different toxicity test data sets for which they are recommended, (2) powerful statistical tests, (3) hopefully "easily'' understood by nonstatisticians, and (4) amenable to use without a computer, if necessary.

56.      Thus, although the 2002 Methods realize other statistical procedures *exist*, USEPA selected the 4 specific statistical methods contained therein (namely (1) Dunnett's Test, (2) the t test with the Bonferroni adjustment, (3) Steel's Many-one Rank Test, or (4) the Wilcoxon Rank Sum Test with the Bonferroni adjustment) after due consideration for the four reasons specified. *Id.;* 67 Fed. Reg. 69964**.** Neither the TST nor any other statistical methods besides those specified in section 9.5.1 (underlining added; bold in original) and discussed in detail in Section 9.6 are authorized:

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

DOWNEY BRAND LLP

9.5.1. The recommended statistical analysis of most data from chronic toxicity tests with aquatic organisms follows a decision process illustrated in the flowchart in Figure 2. An initial decision is made to use point estimation techniques (the Probit Analysis, the Spearman-Karber Method, the Trimmed Spearman-Karber Method, the Graphical Method, or Linear Interpolation Method) and/or to use hypothesis testing (Dunnett's Test. the t test with the Bonferroni adjustment, Steel's Many-one Rank Test, or the Wilcoxon Rank Sum Test with the Bonferroni adjustment). **NOTE: For the NPDES Permit Program, the point estimation techniques are the preferred statistical methods in calculating end points for effluent toxicity tests.** If hypothesis testing is chosen, subsequent decisions are made on the appropriate procedure for a given set of data, depending on the results of the tests of assumptions, as illustrated in the flowchart. A specific flow chart is included in the analysis section for each test.

57.     Neither the text of the 2002 Methods, nor the related flowchart allow for the TST approach to be used in lieu of the promulgated statistical or point estimate approaches. The Toxicity Provisions also contradict the June 18, 2010 USEPA Headquarters memo accompanying the TST Implementation Document, from James Hanlon, the Director of the USEPA Office of Wastewater Management, which stated: "The TST approach does not preclude the use of existing recommendations for assessing WET data provided in EPA's 1991 Water Quality-based Technical Support Document (TSD) which remain valid for use by EPA Regions and the States." The TST method was to be used for *additional* information, not a replacement to be used for water quality standards creation or for compliance determination purposes.

58.     The 2010 USEPA guidance document, *National Pollutant Discharge Elimination System Test of Significant Toxicity Implementation Document,* EPA 833-R-10-003, introduced the TST protocol for analysis of chronic toxicity testing data. This guidance document made it clear in numerous places that the intent of the

DOWNEY BRAND LLP

guidance was to introduce a new method of analyzing data collected during a valid WET analysis, not as water quality criteria guidance or for permitting (emphasis added):

> This document presents TST as a useful alternative data analysis approach for valid WET test data that may be used **in addition to** the approaches currently recommended in EPA's Technical Support Document (USEPA 1991) and EPA's WET test method manuals." EPA 833-R-10-003 at p. 7.

> The TST approach is an alternative statistical approach for analyzing and interpreting valid WET data; it is not an alternative approach to developing NPDES permit WET limitations." EPA 833-R-10-003 at p. 60.

59.     Therefore, the Toxicity Provisions go beyond even the intent and scope of the TST guidance, as well as lack consistency with federal law and regulations.

**E.     Single Chronic Toxicity Tests Being Used for Water Quality Standards**

60.     The preamble to the 2002 WET Rule says "EPA policy states that **"EPA does not recommend that the initial response to a single exceedance of a WET limit, causing no known harm, be a formal enforcement action with a civil penalty.**" 67 Fed. Reg. 69968 (citing EPA memo entitled National Policy Regarding Whole Effluent Toxicity Enforcement (1995a) (emphasis added). The appropriate response to a chronic toxicity test indicating the presence of toxicity is not to declare a violation, but to investigate the cause, starting with follow-up testing to confirm the initial result. *(See accord* 67 Fed. Reg. 69,968 (USEPA policy suggests additional testing is an appropriate initial response to a single WET exceedance ); *see also* Los Angeles Basin Plan at 3-17 (recommending a TIE to identify cause of toxicity prior to imposing effluent limitation to implement the narrative Toxicity objective); *accord* State Water Board's State Implementation Policy (SIP) at pp. 30-3 l(requires TRE, and the failure to conduct required toxicity tests or a TRE results in establishment of chronic toxicity limits in the permit).)

61.     Instead of relying on multiple tests to prove persistent toxicity that could realistically translate into potential instream impacts, the Toxicity Provisions set

DOWNEY BRAND LLP

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

water quality standards based on a single test result. Toxicity Provisions, 2021 Staff Report at 61 ("Attainment of the water quality objective is demonstrated by conducting toxicity testing, analyzing the data using the TST statistical approach, and rejecting the null hypothesis.") Since water quality standards can be and are often incorporated into permits as receiving water limitations, a failure of the toxicity test can be deemed an enforceable violation of the water quality standard, even though that is discouraged by USEPA. 67 Fed. Reg. 69968. The Toxicity Provisions' Staff Report even acknowledges that "[a] statistically significant difference may or may not be biologically significant." Toxicity Provisions, 2021 Staff Report at p. 63. A water quality standard (and water-quality based effluent limitations derived from such standards) set on a single chronic toxicity sample result substantially increases the likelihood of violations for a false "Fail" result, which is anticipated to occur statistically at least 5%-20% of the time, and with certain test species such as *Ceriodaphnia dubia* may be much higher (>50%).[3] Because USEPA did not follow its own guidelines and rules when approving the Toxicity Provisions, USEPA's approval should be invalidated.

## V.     PLAINTIFFS' CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Declaratory Relief Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 – Wrongful Approval of the Toxicity Provisions in Violation of the Administrative Procedures Act)**

62.     Plaintiffs refer to and incorporate by this reference all allegations set forth in paragraphs 1 through 61 above.

63.     The APA authorizes the Court to hold unlawful and set aside final USEPA actions that are "arbitrary, capricious, an abuse of discretion, or otherwise

---

[3] The Toxicity Provisions recognize this problem and commissioned a study to explore the issue, but instead of waiting for the results of the study, just deferred compliance with some of the prescribed limits. However, the water quality standards themselves were not paused and became effective on USEPA's approval.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

not in accordance with law." 5 U.S.C. § 706(2)(A).

64.   USEPA's final agency action to approve the Toxicity Provisions was made without observance of legal requirements under the CWA and federal regulations as required under APA section 706(2)(D), and were not in accordance with law within the meaning of APA section 706(2)(A).  Approval of water quality standards based upon the unpromulgated TST, and that require determining compliance by use of the unpromulgated TST were beyond USEPA's statutory jurisdiction, authority or limitations, within the meaning of APA section 706(2)(C).

65.   USEPA's action approving the State Water Board's water quality standards for whole effluent toxicity based on the unpromulgated TST is contrary to law and federal regulations, including, but not limited to the APA, the CWA and federal regulations such as 40 C.F.R. sections 131.5, 136.3, 136.4-136.6.

66.   USEPA violated the Clean Water Act by unlawfully exceeding the review window of sixty (60) days for approval. 33 U.S.C. § 1313(c)(3). USEPA also failed to confirm that the state's objectives met the requirements of the CWA and were "based on biological monitoring or assessment methods consistent with information published pursuant to section 1314(a)(8)" of the CWA. 33 U.S.C. § 1313(c)(2)(B) & § 1313(c)(3).

67.   USEPA violated federal regulations by approving water quality standards not based on sound scientific rationale (40 C.F.R. § 131.5(a)(2)), and contrary to the requirements contained in federal regulations at 40 C.F.R. Part 131 and Part 136.

68.   USEPA violated federal regulations under Part 131 by not determining that the Toxicity Provisions' water quality standards were attainable or met all the requirements of state law. 40 C.F.R. § 131.2 (defining water quality standards as serving the purposes of the CWA "where attainable"); § 131.5(a)(6).

69.   USEPA violated federal regulations by approving the use of the TST as an applicable water quality standard or sampling method modification not issued in

DOWNEY BRAND LLP

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

a formal rulemaking or ATP in contravention of 40 C.F.R. Part 136 and USEPA guidance, including but not limited to Part 136.6 that restricts method modifications to chemical methods and prohibits modification of method-defined analytes, such as whole effluent toxicity.

70.   USEPA's interpretation of the requirements of 40 C.F.R. Part 131 and Part 136, and the 2002 Methods, as allowing the use of any statistical procedure instead of those specifically delineated in the 2002 Methods, was arbitrary and capricious.

71.   USEPA approved the use of the TST as a part of water quality standards for WET without conformity to requirements for promulgation of test methods under CWA Section 304(h) and 40 C.F.R. Part 136.

72.   USEPA's action was arbitrary and capricious, violated federal regulations, and works great prejudice to the regulated community, including Plaintiffs' members. USEPA violated the APA, the CWA, and regulations implementing CWA section 304(h), and thus acted in an arbitrary and capricious manner, abused its discretion, and acted in a manner not in accordance with law, as set forth herein.

73.   The APA authorizes the Court to hold unlawful and set aside final USEPA actions taken without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

74.   An actual and substantial controversy has arisen and presently exists between Plaintiffs and USEPA regarding the validity of USEPA's May 1, 2023 water quality standards approval letter under federal law and regulations. USEPA's actions as described herein are unlawful and therefore invalid. Plaintiffs are informed and believe that USEPA disputes these contentions.

75.   Because Plaintiffs have no adequate remedy at law for USEPA's actions, and Plaintiffs' members and other similarly situated members of the regulated community will imminently incur substantial harm as the result of

USEPA's wrongdoing, a declaration is necessary to clarify the parties' obligations and to inform the public.

76.     Plaintiffs seek an order pursuant to 28 U.S.C. section 2201 and Federal Rule of Civil Procedure 57, declaring the USEPA action of May 1, 2023, approving of the State Water Board's toxicity water quality standards contained in the State's Toxicity Provisions, void.

**SECOND CLAIM FOR RELIEF**
**(Injunctive Relief Pursuant to 28 U.S.C. § 2202 and Federal Rule of Civil Procedure 65 – Preliminary and Permanent Injunctive Relief)**

77.     Plaintiffs refer to and incorporates by this reference all allegations set forth in paragraphs 1 through 76 above.

78.     Plaintiffs seek an order pursuant to 28 U.S.C. section 2202 and Federal Rule of Civil Procedure 65 to temporarily restrain and preliminarily and permanently enjoin the effectiveness of USEPA's water quality standards approval letter of May 1, 2023 and prevent USEPA from enforcing the portions of that letter that allow the use of the TST for water quality regulation, permitting, and compliance determination purposes.

79.     A substantial likelihood exists that Plaintiffs will succeed on the merits of the claims for the relief pled herein.

80.     Plaintiffs' members are likely to suffer or have already suffered irreparable injury in the absence of preliminary injunctive relief. Many of Plaintiffs' members operate POTWs pursuant to NPDES permits issued by the State Water Board, Regional Water Quality Control Boards, or USEPA that include chronic toxicity testing and compliance provisions. If the effectiveness of USEPA's May 1, 2023 letter is not enjoined, many, if not all, of Plaintiffs' members as well as all dischargers throughout the state will be required to begin using and reporting results from an unpromulgated WET testing method that will likely adversely affect their compliance status. For example, in the Central Valley Region, several permits (for

DOWNEY BRAND LLP

Mountain House and for the Municipal General  Order covering numerous POTWs) are scheduled for adoption in June of 2023 that will modify the chronic toxicity requirements from narrative effluent limits with numeric triggers for further investigation to determine the cause of toxicity (since toxicity itself is not a pollutant), to new permit limits with more frequent monitoring requirements all based on the TST. All wastewater dischargers will eventually have their permits modified in the next five years to incorporate the new Toxicity Provisions' requirements. An injunction is needed to halt this process until a decision on the merits can be obtained.

81.     Imposition of the TST as the mandatory WET testing method under the approved water quality standards will result in an harm to Plaintiffs' members, including increased costs to monitor more often. For example, some of Plaintiffs' members are only required to monitor annually, but under the new Toxicity Provisions, they will be required to monitor monthly instead to determine compliance with new Maximum Daily Effluent Limits ("MDELs") and Monthly Median Effluent Limitations ("MMELs") now required under the Toxicity Provisions, which for POTWs are contrary to federal regulations. 40 C.F.R. § 122.45(d)(2) (requiring "Average weekly and average monthly discharge limitations for POTWs). The Toxicity Provisions even recognized these increased obligations and costs. *See* Toxicity Provisions, 2021 Staff Report at p. 304 (Determining 9 of 13 dischargers analyzed would have an increase in laboratory resources and waste (of water and organisms), and 6 of these would have "significant changes in impacts.") In addition, in order to decrease the likelihood of a false indication of toxicity, many of Plaintiffs' members will undertake the additional replicate samples, which are necessary to reduce the statistical likelihood of being found in violation *even though the actual quality of the water does not change*. *See* Toxicity Provisions, 2021 Staff Report at p. 77 (addition of replicates would have resulted in these tests being declared non-toxic). Adding replicates obviously adds additional cost as well. *Id.* at p. 346.

82.     With new water quality standards approved by USEPA, those standards

1864083v1

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

DOWNEY BRAND LLP

are then used to set water quality-based effluent limitations for industrial and POTW discharges, and to set receiving water limitations for storm water discharges by all municipalities, construction sites, and industrial discharges statewide. 33 U.S.C. § 1342. These new water quality standards will also be used to determine whether waterbodies are in attainment or impaired for toxicity under CWA section 303(d), and whether Total Maximum Daily Loads ("TMDLs") must be adopted to address these impairments. 33 U.S.C. § 1313(d)(4); Toxicity Provisions, 2021 Staff Report at 64 ("For the purposes of 305(b) assessments and 303(d) listing analyses and determining whether a water body exceeds the numeric water quality objective, statistical analysis of the water quality objectives would now be done using the TST approach.") Thus, these water quality standards have immediate applicability, particularly for receiving water limitations that require compliance with "all applicable water quality standards" as these standards are now applicable. Once applicable, these standards can be enforced civilly or criminally by USEPA under Clean Water Act section 1319, and by the State Water Board and Regional Water Boards under the California Water Code. *See, e.g.*, 33 U.S.C. §§ 1319(b), (c) and (g); Cal. Water Code §§ 13350, 13385, 13387; *see also* Toxicity Provisions, 2021 Staff Report at p. 65 ("…it is possible that a discharger may be identified as exceeding the numeric toxicity receiving water limitation.").

83.     Liability is not limited to agency enforcement as third party citizen suits are authorized under the Clean Water Act, subjecting Plaintiffs' members to federal enforcement actions and liability for civil penalties, injunctive relief, and substantial attorneys' fees. 33 U.S.C. § 1365. Given that the source of any toxicity is unknown until determined in a future TIE and TRE, such enforcement is problematic. Further, with the likely increased frequency of false indications of toxicity in WET testing using the TST, Plaintiffs' members will, as a result, suffer from a higher incidence of alleged noncompliance with NPDES permits, even where the toxicity indicated is not real.

DOWNEY BRAND LLP

84.     Immediate injunctive relief is necessary given the fact that many of Plaintiffs' members are in the process of obtaining new or revised NPDES permits from the State Water Board, Regional Water Quality Control Boards, or USEPA that include chronic toxicity testing and compliance requirements based on the Toxicity Provisions. These permits will soon be subject to use of the TST if USEPA is not immediately enjoined from applicability of its May 1, 2023 letter. In addition, the newly USEPA approved standards will now begin to be used to determine impairments in receiving waters, which may result in more waters being listed as impaired based on the TST that were not previously listed using the promulgated methods. Furthermore, this USEPA essentially acts as a rulemaking approving the use of an unpromulgated test method (that also is part and parcel of the water quality criteria) without notice and comment, which violates the APA, stifles public participation, and harms the Plaintiffs' members as well as the public in general.

85.     The threatened injuries outweigh any damage that an injunction may cause the Defendant since an injunction would merely maintain the status quo that existed prior to the issuance of the USEPA's May 1, 2023 letter over the last two decades.

86.     An order enjoining USEPA from enforcing an unlawful mandate is consistent with and serves the public interest.

87.     Because Plaintiffs have no adequate remedy at law for USEPA's actions, and because Plaintiffs' members have or will imminently incur substantial harm as the result of USEPA's wrongdoing, a temporary restraining order, and preliminary and permanent injunctive relief is appropriate. Preliminary injunctive relief will maintain the status quo pending adjudication of this matter and is necessary to forestall irreparable injury to Plaintiffs and their members as demonstrated above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following:

1.     For a declaration that USEPA's issuance of the May 1, 2023 letter

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

DOWNEY BRAND LLP

1  approving the water quality standards included in the State's Toxicity Provisions and

2  mandating the use of the TST violates the CWA, the APA, and/or federal regulations

3  issued pursuant to the APA.

4      2.    An order vacating and setting aside the USEPA's May 1, 2023 water

5  quality standards approval and implicit approval of the use of the unpromulgated TST

6  because these actions were arbitrary, capricious, an abuse of discretion, or otherwise

7  not in accordance with law, and without observance of the procedure required by law.

8      3.    For an order for equitable relief, including a preliminary or permanent

9  injunction, enjoining USEPA and its officers, employees, and agents from approving,

10  imposing, implementing, or enforcing the use of the TST or the use of analytical

11  results obtained by the TST for determining compliance with the CWA, including

12  approval contained in the May 1, 2023 letter approving the toxicity water quality

13  standards as applicable water quality standards under federal law based on the TST

14  until and unless the USEPA complies with all of its obligations as required by law.

15      4.    For attorneys' fees.

16      5.    For costs of suit.

17      6.    For such other and further relief as this Court deems just and proper.

18

19  DATED: May 19, 2023        DOWNEY BRAND LLP
                      By:

20

21

22                            BRIAN HAMILTON
                          Attorney for Plaintiffs

23                            CLEAN WATER SOCAL and

24                            CENTRAL VALLEY CLEAN WATER
                          ASSOCIATION

25

26

27

28

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

DOWNEY BRAND LLP